# Staunton

ESTELLE CRAFFORD WATTS, ET AL., ETC. v. STATE HIGHWAY COMMISSIONER OF VIRGINIA.

T. R. VERMILLION, ET AL. v. STATE HIGHWAY COMMISSIONER OF VIRGINIA.

September 2, 1960.

Record Nos. 5125, 5126.

Present, Eggleston, C. J., and Spratley, Buchanan, Miller and I'Anson, JJ.

The opinion states the case.

*David Nelson Sutton* and *John Paul Causey* (*Sutton & Causey*, on brief), for the appellants.

*Francis C. Lee, Assistant Attorney General* (*A. S. Harrison, Jr., Attorney General; M. Ray Johnston, Assistant Attorney General*, on brief), for the appellee.

MILLER, J., delivered the opinion of the court.

In these two cases the State Highway Commissioner filed separate petitions for condemnation for highway purposes of land owned by T. R. Vermillion and Marguerite S. Vermillion, and by Estelle Crafford Watts and Virginia Trust Company, executors of Robert B. Watts, deceased, and the devisees under decedent's will, who will at times be referred to as appellants.

At the time these petitions were filed the Commissioner filed petitions against Frederick H. Gilliam, and R. B. Gilliam, et al., owners of nearby or adjoining tracts and sought to condemn parcels of their land also needed for highway purposes. The Vermillions and the Watts' estate were represented by the same counsel but Mr. V. M. Geddy represented the Gilliams.

On November 11, 1958, orders were entered appointing commissioners in the Vermillion and Watts cases and similar orders were entered in the two cases against the Gilliams. The same commissioners were designated in each case, and the cases were set for trial on December 16, 1958. The court indicated that the cases would be heard together, and appellants then expressed their objection to that procedure.

On December 16, before trial, counsel renewed their objection to hearing the four cases together and moved for separate trials. They insisted that consolidation of the four cases by trying them together was contrary to the statute and asserted that the issues should be heard separately because "different factors involved in each case

would be confusing to the commissioners." The court replied that it had been the practice in that area "to try several adjoining tracts together," but indicated that whenever the State Highway Commissioner might desire separate trials, the court would "give it some consideration." The motion was overruled and appellants excepted.

After hearing the evidence in the four cases and viewing the lands, the commissioners made separate reports in each case.

The awards of compensation and damages to appellants follow:

T. R. Vermillion and Marguerite S. Vermillion: Land, $3,235.00; damages, $10,600.00.

Watts Estate: Land $3,000.00; damages, $7,500.00.

A statement by the court in appellants' cases indicates that the following awards were made to the Gilliams:

R. B. Gilliam and Elizabeth A. Gilliam: Land (.01 acre), $100.00; damages, $200.00.

Frederick H. Gilliam: Land (3.27 acres), $12,000.00; damages, $23,000.00.

Exceptions to the reports were overruled. They were substantially the same as appellants' assignments of error, which are to the effect that the court erred by requiring them to (1) try their cases together and along with the Gilliam cases; (2) by admitting irrelevant and improper evidence; and (3) by confirming the awards which appellants assert are insufficient and contrary to the evidence.

The proceedings were instituted under Title 33, ch. 1, Article 5 (§§ 33-57 to 33-75, Code 1950, as amended) to acquire land needed for a limited access highway adjacent to State route 31, which extends in a somewhat northerly and southerly direction in James City county, Virginia. Three strips or parcels of land belonging to the Vermillions and containing respectively .058 of an acre, .87 of an acre, and .23 of an acre, a total of 1.158 acres, are sought to be acquired. The first two parcels are situate next to the existing east right-of-way line of route 31, and adjacent to and north of the Jamestown Festival parking lot; the third parcel is across route 31 and adjacent to its west right-of-way line. The strip or parcel of land of 1.16 acres belonging to the Watts' estate lies on the west side of the existing right-of-way line of route 31 opposite Jamestown Festival parking lot. The lands belonging to the Gilliams condemned at the same time and for the same project are situate adjacent or near to the parcels belonging to appellants, but slightly northward therefrom.

A number of witnesses testified to the value of the several parcels and tracts of land and the resultant damage to land not taken. In doing so they at times testified as to specific factors or circumstances affecting different parcels or tracts of land not pertinent to other parcels or tracts. There was also testimony showing the damage caused specific tracts of land, such as the destruction of or damage to Frederick H. Gilliam's yard, buildings, fruit trees, water system, drainage field, and the like. Marked variation in the values attributed to the several parcels taken and to the tracts, as well as in estimates of damages resulting to the residue of the several tracts appear in the testimony of different appraisers.

Morton G. Thalhimer, real estate agent and appraiser, valued the Vermillion property on the east side of route 31 nearest to the Jamestown Festival Park at $4,000 per acre and that more remote at $1,750 an acre. The Vermillion property on the west side of route 31 he valued at $1,500 an acre. His total valuation of the 1.158 acres taken was $2,110, with damages of $3,850 to the residue. This witness considered the Watts property on the west side of the highway across the road from the Jamestown Festival Park to be worth $1,500 an acre, and he gave a valuation of $2,120 for the 1.16 acres taken and $6,300 damages to the residue. The Frederick H. Gilliam property on the east side of the highway was valued by him at $1,000 an acre and that on the west side at $1,200 an acre. He valued the R. B. Gilliam property on the east side of the highway at $1,000 per acre.

E. E. Falk, real estate agent and appraiser, valued all the Vermillion property at $1,000 per acre and estimated the value of the 1.158 acres taken at $1,160 and damages to the residue of $2,362. He valued the Watts property at $1,500 per acre and the land taken at $1,740, with damages of $11,075 to the residue. He fixed the value of the Frederick H. Gilliam property at $1,000 per acre.

George M. Lanier, realtor and appraiser, testified that the Vermillion land east of route 31 was worth $10,000 an acre and that lying west of the highway, $12,000 an acre. He fixed the value of the Vermillion land taken at $12,040, with resulting damages of $121,400. He valued the Watts property at $10,000 an acre and the land taken at $11,600, with resulting damage of $110,000. The property of Frederick H. Gilliam nearest to the Vermillion land he valued at $7,500 per acre and that northwardly and more distant at $4,000 per acre.

R. C. Benschoten considered the Vermillion property taken worth $18,520, with resultant damages of $130,000. He valued the Watts land at $12,000 per acre and the parcel taken at $18,520, with resultant damages of $130,000. He did not value the Gilliam property.

Thomas H. Savage, a local real estate agent, valued the 3.27 acres of the Frederick H. Gilliam property taken at $10,000 per acre, *i.e.* $32,-700, with resulting damage to his remaining 33 acres of $500 per acre, *i.e.*, with an added item of $5,000 damage to his residence and curtilage, a total of $55,200. He did not testify on the value of the other parcels or tracts of land.

While Mark H. Culbertson, highway right-of-way agent, was testifying as to the location of the tracts of land, the size and location of the parcels condemned, their proximity and accessibility to route 31, cross-overs and similar matters, one commissioner evidenced concern because it did not appear that the remaining property of Frederick H. Gilliam enjoyed accessibility to the limited access service road as did other property involved. He propounded questions to the witness for enlightenment on that matter. The most pertinent of his interrogations, along with those by the court, and witness' answers follow:

"BY A COMMISSIONER:

"Q. Why is his property so much different from Watts that he cannot use the service road to come on here?

"A. Mr. Gilliam's property primarily, the way it is set up, faces these roads over here. In other words his house faces the secondary road over here. He has access to the secondary road.

\*     \*     \*     \*     \*     \*     \*

"BY THE COURT:

"Q. Mr. Culbertson, let me ask you this question to clear up a point, if I may: There is no service road constructed along here as constructed in front of the Vermillion-Watts property?

"A. That is correct. That is not one.

\*     \*     \*     \*     \*     \*     \*

"BY A COMMISSIONER:

"Q. Let me ask you this: In case they do build a service road, he still cannot use it, is that right?

"A. He still could not. The limited access feature is just outside the proposed right-of-way line, as I said before.

"MR. GEDDY: The service road would have to be built between the limited access line and the main highway.

"Q. I cannot understand how you all operate. If this man down here has access to the service road at any point, why can't Mr. Gilliam use it?"

Appellants contend that much evidence as to values and damages in the Gilliam cases was irrelevant and improper in their cases and that the foregoing questions by a commissioner show that the commissioners were concerned about Gilliam's lack of access to the road and directed their attention unduly to that property. It is then asserted and argued that Gilliam's lack of access to the road, the commissioners' evident concern about that circumstance, and the wide variance between the awards for the Gilliam lands and the awards for the Watts and Vermillion lands is confirmative of appellants' contention that appellants' rights were prejudiced and subordinated to those of other litigants.

Appellants remind us that the testimony of each witness who valued the parcels of land shows that land diminishes in value as it extends northwardly and away from the Jamestown Festival area. It is then pointed out that although the witnesses were in accord on this circumstance, yet the commissioners awarded Vermillion approximately $2,850 per acre and the Watts' estate approximately $2,580 per acre while the award to Frederick H. Gilliam for property more distant from the Festival Park area was at the rate of $3,630 per acre and the award to R. B. Gilliam at the rate of $10,000 per acre. The damage awards for the Gilliam lands were also greater in proportion than the damage awards to Vermillion and Watts. After making these observations appellants state that "it is obvious that the commissioners were influenced from the start by the denial of access to Gilliam and that the interests of each of the appellants were prejudiced by this."

The State Highway Commissioner concedes that there is no statute which expressly authorizes or prohibits trial of *highway condemnation cases* together but points out that such practice has been indulged in for a long time without condemnation by the legislature and asserts that it is within the sound discretion of the court.

That it is proper to join a number of owners of separate parcels of land in one petition and appoint one set of commissioners to fix compensation and damage is indicated in §§ 25-8 and 25-9 of Title 25, ch. 1, entitled "Condemnation Generally." In *Hannah* v. *City of Roanoke*, 148 Va. 554, 564, 139 S. E. 303, this was done. There the court said:

"In 20 C. J. 921, the law is stated thus: 'Where it is sought to condemn several tracts of land belonging to different owners, all the owners may be joined in one proceeding, in the absence of any statutory provisions to the contrary. Such a cause is convenient and can injure no one if damages are separately assessed to each other. But the condemning party need not join all the owners.'

"There is no statute requiring a separate proceeding as to each landowner. On the contrary, section 4364 [now §§ 25-8, 25-9] indicates a joinder of parties by requiring a 'memorandum' to be filed 'showing the names and residences of the owners of such land, or other property.'

"Sections 4365 and 4366 [now §§ 25-10, 25-11, 25-12 to 25-15] contemplate the appointment of commissioners in each separate case; but the condemnor having united all the defendants in one proceeding, there is no reason why the same commissioners could not be appointed in all cases."

Under § 25-27, Code 1950, providing for the appointment of commissioners in condemnation proceedings by railroads, the practice of filing one petition against several owners of separate parcels of land and appointing one set of commissioners is expressly permitted.

This practice is also permitted in Title 25, ch. 4, entitled "The Public Park Condemnation Act."

In *Rudacille* v. *State Commission on Conservation and Development*, 155 Va. 808, 156 S. E. 829, condemnation proceedings were instituted under Acts 1928, ch. 410, p. 1036, which, as amended, is Title 25, ch. 4, Code 1950, as amended. Under § 6 of the Act of 1928, which, as amended, is now § 25-127, *et seq.*, Code 1950, the condemner is authorized to join the several landowners in one petition, and in the *Rudacille* case this court expressed its approval of the practice thus:

"It is next said that the landholders affected should not be convened in one proceeding. It appears that there are something like two thousand of them living within the proposed park area. Individual petitions would be needlessly expensive and would serve no good purpose. All that can be asked is that there be in each case a separate assessment of damages. * * *" (At page 814)

Filing separate petitions against several owners of distinct parcels of land, all to be acquired in one highway project, and thereafter proceeding against the several owners and parcels of land in one trial, or joining owners of separate parcels of land in one petition and

proceeding against them in one trial is a difference in form but not in substance. Where several landowners on the same project are joined in one petition or where separate petitions are filed against each owner, but the proceeding in each instance is consummated in one trial with separate awards as to each owner, the chief purpose in each instance is the same, *i.e.*, to avoid numerous trials, unnecessary costs and delays.

There is no express legislation in Title 33, Article 5, authorizing separate petitions filed against owners of different tracts of land to be tried together. Yet § 33-60 states that the proceedings shall be by petition which shall describe the land to be acquired and set forth the name or names of the landowners. Fairly construed, this language contemplates and authorizes the joinder in one petition of owners of distinct parcels of land. Under § 33-59 it is declared that "the procedure shall, except insofar as altered by this article, be *mutatis mutandis*, the same as is prescribed by law for railroad corporations." It is thus apparent that when these two sections of the Code are read and considered along with § 25-27, Code 1950, it is made certain that it is within the sound discretion of the trial court to determine whether or not petitions filed against owners of separate parcels of land to be acquired by the State for the same highway project shall be tried separately or together. We find nothing in the character or location of the several tracts or parcels of land proceeded against or in the number of petitions that were tried together (separate awards having been made in each instance) that tends to show that the court abused its discretion or that the interests or rights of the appellants were prejudiced thereby.

■ Over the objection of appellants the Highway Commissioner introduced in evidence an application for a building permit made by Vermillion on December 17, 1956, requesting authority to erect a tourist court for $200,000 and an amendment under date of February 11, 1958, changing the $200,000 to $400,000. Admission of this application was objected to because it did not identify the property to be used and the motel was never built, and because it was irrelevant, hearsay and a self-serving statement. Condemner asserts that its introduction was proper because it tended to refute the landowners' claim that his property was damaged for commercial development by construction of the limited access road. We find nothing to indicate that admission of this application had any prejudicial effect upon appellant.

The testimony of the several witnesses to the value of the land taken and damage to the residue is to the general effect that the value of the land involved diminished with increased distance from the Festival Park area. Yet there were factors in evidence other than the distance of the land from the Festival Park that could affect its value, and the testimony of individual appraisers is, in many instances, in sharp conflict on the value per acre of different tracts and the resultant damage. It is to be also remembered that the commissioners viewed these tracts and parcels of land and were in a position to arrive at and form their own conclusions on the values and resultant damage to each tract. Here each award for land taken and damage to the residue is well within the values and amounts set by competent appraisers.

The fact that there were instances where relevant testimony was admitted as to the value of one parcel taken or as to the damage to the residue of that tract, which was not relevant to the value of other parcels taken or to the damage to the residue of those tracts is not shown to have been prejudicial to appellants, and its admission was at most, in this case, harmless error.

That the Gilliams were awarded more per acre for their land and more liberal damages than awarded and allowed to the Vermillions and the Watts' estate for their acreage and resultant damage does not indicate that the awards and damages allowed the latter were inadequate. *Non constat* the compensation and damages allowed the Gilliams may have been overly liberal.

"Time and time again, this court has said, in varying language, that the report of the commissioners is entitled to great weight, is *prima facie* correct, and must be confirmed unless 'good cause be shown against it.' Where there is a conflict of evidence before the commissioners neither the trial court nor this court can set aside the award unless it be shown that the commissioners proceeded upon erroneous principles, or unless the amount allowed is so grossly inadequate or excessive as to show prejudice or corruption on their part. This is so because commissioners may base their finding largely upon facts obtained by their own view of the property which do not appear in the record." *Kornegay* v. *City of Richmond*, 185 Va. 1013, 1024, 41 S. E. 2d 45. *Virginia Electric & Power Co.* v. *Pickett*, 197 Va. 269, 89 S. E. 2d 76; *Ryan* v. *Davis*, 201 Va. 79, 109 S. E. 2d 409.

There is nothing that occurred during the trial which shows that the commissioners proceeded upon erroneous principles or were in-

fluenced by other than the evidence before them and their view of the premises. This being true and the awards being supported by substantial and credible evidence, the judgments of the trial court must be affirmed.

*Affirmed.*